Peck, J. ’
delivered the opinion of the court. r
The cause is before us upon the whole record, and the judgment to be given, which that record will justify, is the question to be settled.
In this country, as in England, from whence so much of our law is derived, the trial by jury is the pride and boast of the citizen, it should be the business of the courts to see it- preserved; as long as liberty shall be considered lovely it will be cherished. It ought not to be defeated by direct or indirect means, and under the constitution the benefits it confers should be speedy. Without imputing blame to any one it may be said, for the record justifies it, that the whole case presents a novel spectacle, and that the prisoner has at least been unfortunate whatever may have been his crime. Near five years confined, twice before us upon errors, four juries having had him in charge, the number of special verdicts rendered a burden to the court, and finally, the sentence of death pronounced upon the one last given, and this court thrown back upon the first verdict. These remarks are deemed proper, because the court feel utterly averse to a course of practice that may seem to tolerate a privilege in the State to have a venire facias de novo as often as she may deem it expedient.
We therefore express a decided opinion, that the court having received the special verdict and discharged the jury should have proceeded upon the finding. Why-should the court, when the jury could do no more, then make the expression contained in the verdict, and the court be content with and receive it afterward, pronounce it a nullity and begin again — if it can be done at pleasure where will it end.
Settling the question, therefore, that the first special verdict fixes the fate of the prisoner, it will be for us now to examine that verdict, and affix to it the appropriate judgment. Our attention is directed to the find *513 ing, to see if there is in it that malice, either express • t j i • t. , , . \ , or implied, which constitutes the crime of murder. The prisoner and deceased were “upon a match at shooting,” after it was ended, a quarrel ensued about who had won the match. The deceased used provoking language— called the prisoner a liar repeatedly: the prisoner had then and there a heavy rifle in his hands, walked to the deceased slowly and asked him if he called him a God damned liar, to which the deceased said he did. Whereupon the prisoner instantly struck the deceased two violent blows upon the neck and head. The weapon and the manner of using it was likely to produce death and great bodily harm — the deceased died of the wound. The blow was given upon a sudden quarrel, but there was no other provocation than abusive language, but of the malice they are not convinced, but upon the facts the law and malice is submitted to the court, &c.
In this finding it is not shown with what weapon the fatal blow was inflicted; in a case so serious the court should see that all such matters as , go to effect the life of the prisoner should not only be directly found, but should negative the possibility of the death having proceeded from any other cause. There is no such immediate connection between the weapon the prisoner had and held in his hand, and the blow struck, which produced the death, as makes it certain that the blow was with that weapon. The certainty required must be certainty to every intent. Admit it to be true, that one weapon may be charged in the bill of indictment, and another proved to a jury as the instrument of the death; and that this, where the jury are satisfied of the malice, will authorize a general verdict of guilty. Still, where the finding is special, the jury should, they doubting of the malice, show to the court what kind of weapon was then and there used to produce the killing, otherwise the court cannot imply the malice. In- other words, as the question in such a case is the implied malice arising *514 alone from the unlawfulness of the weapon used, how , . .... , , can the imputation arise u no weapon be shown,
it may be true from the finding, that the deceased had his gun at the time of the sudden quarrel, that he advanced with it, but it may not be true that the blow was stricken with that instrument; at this very point his story of the transaction stands disjointed, and nothing but an inference, which the law forbids, will connect it.
But again, if it was permitted, the court to draw an inference that it was a weapon, such as from the use thereof malice might be implied, how would this court act in a case where the jurors themselves express a doubt of the malice, as one presumption may be met by another. This part of the finding raises a presumption against the use of such an unlawful weapon as implies malice, for we are not to forget that the jury had every aid the court could give, touching every point the cause presented, and yet they doubted. Certainly, then, this court from the uncertain premises before us must doubt also; the arguments here might be amplified, but it will be sufficient to refer to authorities.
Plummer’s case, Kelying 111, is a strong authority, there it was not found that the gun when discharged was held upon the deceased.
The court says, “we are not to judge the law upon evidence of a fact, but upon the fact as it is found.” This case when examined, turned upon the intent, and though the parties charged were doing an unlawful act, when the death ensued, the intent is not shown by finding the fact of presenting the gun against the officer, and the court so far from aiding the finding by any in-tendment, it will be seen in the opinions delivered, that the intendment can just as well be taken in relief of the prisoner as against him.
The analogy seen in the case before us and that case, consists in this — here the intent is attempted to be proved by the use of the kind of weapon. In Plummer’s case, *515 it consisted in the manner of using the weapon; in Plum-mers case the weapon was a deadly one, but in this case no weapon with which the blow was- struck is described, so that we have not the fact found from which malice may be implied.
The other cases referred to and relied upon by the prisoner’s counsel, are Cam. Rep. 180; 2 Stra. 1015; Cowper R. 830; Hawkins P. C. ch. 47; 2 East 784, 788; Doug. 217; Kelying 7, 72; Bac. Ab. Tit. Verdict 2; Modern 245. These have a bearing in favor of the prisoner, many of them pretty much in point. The case in 2 Modern is an extremely strong ease, and being in a civil proceeding is unanswerable.
It is however urged from the part of the finding, “that the weapon and manner of using it was likely to produce death, and that of the wounds he died,” &c. makes out the malice implied. But here the same objection lies, what weapon was used? And still more to the point, no where in this finding is the intent shown, to make out a case of murder; from the facts found, the intent of the prisoner to kill, where no implication can arise from a description of the instrument, ought to’appear — this rule is inferable from Mary Hazles and the Shepherds case. In these cases the juries found that the weapons which are described were such as would be likely to produce death, but that the prisoners, in giving the blow, did not intend to kill; and notwithstanding the implication in these cases, arising from the weapon, that implication was rebutted by finding a want of intention. Take the verdict, therefore, in any aspect, no weapon is described, of the malice the jury doubt, ■ and there being nothing to found the implication of malice upon, it must be considered as wanting. What judgment, then, ought to have been given upon this finding? About this it seems to the court there can be but one opinion. It is clear the prisoner is guilty of the slaying in heat and passion upon a *516 sudden quarrel; he is therefore guilty of the crime of manslaughter.
The judgment is reversed, and this court proceeding to give such judgment as the court below should have rendered; allow to the prisoner the benefit of clergy. Order that he be burned in the hand, &e. &c.
Judgment reversed.